1

2

3

4                                                    E-FILED on 3/28/12

5

6

7

8                    IN THE UNITED STATES DISTRICT COURT

9                 FOR THE NORTHERN DISTRICT OF CALIFORNIA

10

11   ESTEBAN NERI, JR.,                    )     No. C 10-2867 RMW (PR)
                                           )
              Petitioner,                  )     ORDER DENYING PETITION
12                                         )     FOR WRIT OF HABEAS
        vs.                                )     CORPUS; DENYING
13                                         )     CERTIFICATE OF
                                           )     APPEALABILITY
14   WARDEN KATHLEEN ALLISON,              )
                                           )
15            Respondent.                  )
     _____ )
16

17        Petitioner, a state prisoner proceeding pro se, filed a petition for a writ of habeas corpus

18   pursuant to 28 U.S.C. § 2254.  The court ordered respondent to show cause why the petition

19   should not be granted.  Respondent has filed an answer addressing the merits of the petition.

20   Although given an opportunity, petitioner has not filed a traverse.  Having reviewed the briefs

21   and the underlying record, the court concludes that petitioner is not entitled to relief based on the

22   claims presented and DENIES the petition.

23                                  **BACKGROUND**

24        On April 6, 2005, 14-year old Ashley was at the park with her boyfriend, Luis.[1]  (Resp.

25   Ex. 6 at 2.)  Across from Ashley and Luis was Lenin Ruiz, also known as Smokey, who was

26   _____

27        [1]  The facts of this case are taken from the California Court of Appeal's opinion in People
     v. Neri, No. H032072, 2009 WL 583583 (Cal. Ct. App. March 9, 2009).  (Resp. Ex. 6.)
28

Order Denying Petition for Writ of Habeas Corpus; Denying Certificate of Appealability
G:\PRO-SE\SJ.Rmw\HC.10\Neri867den.wpd

1  walking while talking to someone on a bike.  (Id.)  Lenin was wearing a hat that belonged to

2  Ashley's 17-year old brother, Nicholas.  (Id. at 2-3.)  Lenin had taken Nicholas' hat a few weeks

3  prior when Lenin and three Sureño gang members tried to "jump" Nicholas.  (Id. at 3.)  Nicholas

4  had problems with the Sureño gang members because he often wore red.  (Id.)

5        Ashley saw Lenin, and she and Luis yelled insults at him.  (Id.)  Lenin responded by

6  yelling back at them.  (Id.)  When asked, Lenin acknowledged that the hat belonged to Nicholas

7  and said, "yeah, I jumped that fool, I earned it.  If he wants it, he can come and get it."  (Id.)

8  Ashley called Nicholas on his cell phone and told him where Lenin was.  (Id.)  Nicholas went

9  home and got an aluminum baseball bat.  (Id.)  Lenin saw Nicholas and ran into a nearby

10  apartment complex.  (Id.)  Nicholas ran after him.  (Id.)  Ashley and Luis followed Nicholas.

11  (Id.)  Nicholas went into the apartment complex but later came out, saying that Lenin was the

12  person who "jumped" him.  (Id.)  Nicholas' friends had joined him by then, and Nicholas, his

13  friends, Luis, and Ashley walked back to Nicholas' house.  (Id.)  A few minutes later, Nicholas'

14  group saw Lenin and other Sureño gang members on Fair Avenue.  (Id.)  The two groups yelled

15  at each other and challenged each other to fight.  (Id.)

16        At this time, Buffie Johnson, the mother of Ashley and Nicholas, was at home when she

17  was told that Nicholas was about to fight.  (Id.)  She drove to Fair Avenue looking for Nicholas

18  while Eddie, Nicholas' friend, ran over to the fight.  (Id.)  When Buffie arrived, she went over to

19  stand between Nicholas' group and Lenin's group, and yelled at everyone to break it up and

20  leave.  (Id. at 3-4.)  Lenin's group ran down Fair Avenue.  (Id. at 4.)  Nicholas' group started to

21  run after them, and then turned around and went back to Buffie's house.  (Id.)

22        Buffie, Eddie, Ashley, Luis, Nicholas and his friends, two of Buffie's younger children,

23  and Buffie's mother all stood outside Buffie's house and talked.  (Id.)  After about five minutes,

24  a car drove up the street toward them, turned around in a nearby driveway, and drove back the

25  way it came.  (Id.)  A few minutes later, a large group of people came up the street toward

26  Buffie's house from the same direction the car had come.  (Id.)  Lenin was part of this group.

27  (Id.)  Some of the people had bats, some had sticks, and some had crowbars.  (Id.)

28

Order Denying Petition for Writ of Habeas Corpus; Denying Certificate of Appealability
G:\PRO-SE\SJ.Rmw\HC.10\Neri867den.wpd

1   Lenin approached Nicholas and said, "I'm back. I'm back." (Id.) Petitioner was with

2   Lenin's group. (Id.) Petitioner pulled out a gun and pointed it at Buffie, who was standing next

3   to Eddie. (Id.) Buffie yelled at everyone to go in the house. (Id.) Buffie told petitioner to wait,

4   and she was going to call the police. (Id.) She pulled out her phone while the others started to

5   run to the garage. (Id.) Petitioner shot her in the arm and continued shooting. (Id.) Buffie

6   received gunshot wounds to her side and neck, and when she turned around to try to get into the

7   house, she was shot in the back and fell to the ground. (Id.)

8   Ashley ran to the garage before hearing any gunshots. (Id.) Luis had been standing in

9   the driveway with Ashley, and he ran to get inside. (Id.) He heard gunshots before he got

10   inside. (Id.) One bullet flew close by him and landed in the side wall of the garage two or three

11   feet in front of him. (Id.) He heard more shots after he got inside. (Id. at 4-5.) Another friend,

12   William, ran to the garage as soon as he heard the first gunshot, and heard more shots as he ran

13   into the garage. (Id. at 5.) Another friend, Arthur, ran inside the garage after seeing one shot

14   being fired at Buffie. (Id.) Nicholas remembers one gun being fired four or five times toward

15   Buffie and Eddie. (Id.) Eddie died on the scene from one gunshot wound to the back. (Id.)

16   Petitioner was convicted by jury in Santa Clara County Superior Court for first degree

17   murder of Eddie Lopez, one count of attempted murder of Buffie Johnson, and one count of

18   attempted murder of Luis Lopez. (Id. at 1.) He was sentenced to 100 years plus 24 years 8

19   months. (Id.) In 2008, the California Court of Appeal affirmed. In 2009, the California

20   Supreme Court denied review. Petitioner filed the instant federal petition on June 29, 2010.

21   **DISCUSSION**

22   **A.   Standard of Review**

23   This court may entertain a petition for writ of habeas corpus "in behalf of a person in

24   custody pursuant to the judgment of a state court only on the ground that he is in custody in

25   violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a).

26   Under the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), a district court

27   may not grant a petition challenging a state conviction or sentence on the basis of a claim that

28

1  was reviewed on the merits in state court unless the state court's adjudication of the claim

2  "(1) resulted in a decision that was contrary to, or involved an unreasonable application of,

3  clearly established federal law, as determined by the Supreme Court of the United States; or

4  (2) resulted in a decision that was based on an unreasonable determination of the facts in light of

5  the evidence presented in the state court proceeding."  28 U.S.C. § 2254(d).  The first prong

6  applies both to questions of law and to mixed questions of law and fact, <u>Williams v. Taylor</u>, 529

7  U.S. 362, 384-86 (2000), while the second prong applies to decisions based on factual

8  determinations, <u>Miller-El v. Cockrell</u>, 537 U.S. 322, 340 (2003).

9        "Under the 'contrary to' clause, a federal habeas court may grant the writ if the state

10  court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of

11  law or if the state court decides a case differently than [the] Court has on a set of materially

12  indistinguishable facts." <u>Williams</u>, 529 U.S. at 412-13.  A state court decision is an

13  "unreasonable application of" Supreme Court authority, falling under the second clause of

14  § 2254(d)(1), if the state court correctly identifies the governing legal principle from the

15  Supreme Court's decisions but "unreasonably applies that principle to the facts of the prisoner's

16  case." <u>Id.</u> at 413.  The federal court on habeas review may not issue the writ "simply because

17  that court concludes in its independent judgment that the relevant state-court decision applied

18  clearly established federal law erroneously or incorrectly."  <u>Id.</u> at 411.

19        Under 28 U.S.C. § 2254(d)(2), a state court decision "based on a factual determination

20  will not be overturned on factual grounds unless objectively unreasonable in light of the

21  evidence presented in the state-court proceeding."  <u>Miller-El</u>, 537 U.S. at 340.

22        In determining whether the state court's decision is contrary to, or involved an

23  unreasonable application of, clearly established federal law, a federal court looks to the decision

24  of the highest state court to address the merits of a petitioner's claim in a reasoned decision.

25  <u>LaJoie v. Thompson</u>, 217 F.3d 663, 669 n. 7 (9th Cir. 2000).  Here, that decision is the California

26  Court of Appeal.

27

28

Order Denying Petition for Writ of Habeas Corpus; Denying Certificate of Appealability
G:\PRO-SE\SJ.Rmw\HC.10\Neri867den.wpd

**B.    Petitioner's Claims**

As grounds for federal habeas relief petitioner claims that: (1) there is insufficient evidence to support his conviction for attempted murder of Luis Lopez; (2) there is insufficient evidence to support a finding of a pattern of criminal gang activity; (3) the trial court's jury instructions regarding "kill zone," combined with the prosecution's argument on the specific intent required for attempted murder diluted the prosecution's burden of proof; (4) the trial court erred in failing to instruct the jury that it had to consider each count separately; and (5) the trial court's imposition of an aggravated sentence violates Cunningham v. California, 549 U.S. 270 (2007).

1.    Sufficiency of the Evidence for Attempted Murder of Luis Lopez

Petitioner argues that the evidence did not support a conviction for attempted murder of Luis Lopez because it was insufficient to show that he had a specific intent to kill Luis Lopez when he fired the gun in an area that the prosecutor characterized as the "kill zone."

Under California law, attempted murder requires a specific intent to kill; implied malice will not suffice.  (Resp. Ex. 6 at 13.)  California recognizes, however, the concept of a kill zone: "[A] shooter may be convicted of multiple counts of attempted murder on a 'kill zone' theory where the evidence establishes that the shooter used lethal force designed and intended to kill everyone in an area around the targeted victim (i.e., the 'kill zone') as the means of accomplishing the killing of that victim.  Under such circumstances, a rational jury could conclude beyond a reasonable doubt that the shooter intended to kill not only his targeted victim, but also all others he knew were in the zone of fatal harm.  As we explained in [People v.] Bland, 'This concurrent intent [i.e., "kill zone"] theory . . . is simply a reasonable inference the jury may draw in a given case: a primary intent to kill a specific target does not rule out a concurrent intent to kill others.'"  (Id. at 13-14) (citing People v. Bland, 28 Cal. 4th 313 (2002)).  This statement of California law is binding on this court.  See Bradshaw v. Richey, 546 U.S. 74, 76 (2005) (state court's interpretation of state law, including one announced on direct appeal of challenged conviction, binds federal habeas corpus court.).  Further, "a person who intends to

Order Denying Petition for Writ of Habeas Corpus; Denying Certificate of Appealability
G:\PRO-SE\SJ.Rmw\HC.10\Neri867den.wpd

1   kill can be guilty of attempted murder even if the person has no specific target in mind.  An

2   indiscriminate would-be-killer is just as culpable as one who targets a specific person."  People

3   v. Stone, 46 Cal. 4th 131, 140 (2009).

4          In rejecting petitioner's sufficiency of the evidence claim the California Court of Appeal

5   reasoned:

> Here, the evidence established that [petitioner] used lethal force designed and
> intended to kill everyone around his targeted victim.  Buffie was standing in
> the front yard of her home with Nicholas.  Eddie was nearby, as were
> Nicholas's friends Arthur and William and other members of Buffie's family.
> Ashley and Luis were in the driveway of the home.  [Petitioner] fired a flurry
> of bullets at the gathering from close range.  He thereby used lethal force and
> created a kill zone.  Buffie was immediately hit.  Eddie and Luis attempted to
> flee the flurry of gunshots by running into the garage of the home.  Eddie was
> shot in the back.  One of the shots passed close by Luis and lodged into the
> side wall of the garage two or three feet in front of him.  The act of firing
> toward Luis at close range in a manner that would have inflicted a fatal wound
> if the bullet had been on target is sufficient to support an inference of intent to
> kill.  [Citation omitted.]  Even if the jury found that defendant primarily
> wanted to kill Buffie or Eddie, it could also have found a concurrent intent to
> kill Luis.  [Citation omitted.]  Either finding would fully support the attempted
> murder conviction as to Luis, and there is substantial evidence to support
> either finding.

15  (Resp. Ex. 6 at 15.)

16         The Due Process Clause "protects the accused against conviction except upon proof

17  beyond a reasonable doubt of every fact necessary to constitute the crime with which he is

18  charged."  In re Winship, 397 U.S. 358, 364 (1970).  A state prisoner who alleges that the

19  evidence in support of his state conviction cannot be fairly characterized as sufficient to have led

20  a rational trier of fact to find guilt beyond a reasonable doubt therefore states a constitutional

21  claim, which, if proven, entitles him to federal habeas relief.  Jackson v. Virginia, 443 U.S. 307,

22  321, 324 (1979).  The federal court determines only whether, "after viewing the evidence in the

23  light most favorable to the prosecution, any rational trier of fact could have found the essential

24  elements of the crime beyond a reasonable doubt."  Id. at 319.  Only if no rational trier of fact

25  could have found proof of guilt beyond a reasonable doubt, may the writ be granted.  Id. at 324.

26  When considering a sufficiency of the evidence claim the court must "view [ ] the evidence in the

27  light most favorable to the prosecution," id. at 319, so must assume that the jury believed the

28

1   prosecution's witnesses.

2       If confronted by a record that supports conflicting inferences, a federal habeas court

3   "must presume – even if it does not affirmatively appear on the record – that the trier of fact

4   resolved any such conflicts in favor of the prosecution, and must defer to that resolution."

5   Jackson, 443 U.S. at 326.  The court may not substitute its judgment for that of the jury.  See

6   Cavazos v. Smith, 132 S. Ct. 2, 6-7 (2011)  (per curiam) (finding that the Ninth Circuit erred by

7   substituting its judgment for that of California jury on the question whether the prosecution's or

8   defense's expert witnesses more persuasively explained the cause of death).  Nor may it fail to

9   consider all of the evidence admitted at trial in light most favorable to the prosecution.  See

10  McDaniel v. Brown, 130 S. Ct. 665, 673-74 (2010) (finding that the Ninth Circuit erred by

11  failing to consider all of the evidence in light most favorable to the prosecution when it resolved

12  inconsistencies in testimony in favor of petitioner); see also LaMere v. Slaughter, 458 F.3d 878,

13  882 (9th Cir. 2006) (in a case where both sides have presented evidence, a habeas court need not

14  confine its analysis to evidence presented by the state in its case-in-chief).

15      Petitioner does not argue that the state court's factual findings were incorrect or

16  unreasonable.  In light of the record presented, a rational jury could find that petitioner intended

17  to kill anyone in the area of the group running to the house, which included Luis Lopez.  This

18  court presumes that the jury resolved all conflicting inferences in favor of the prosecution, which

19  support the attempted murder of Luis Lopez under Bland or Stone.  See Jackson, 443 U.S. at

20  326.  Thus, there was sufficient evidence to support the verdict of attempted murder, and hence,

21  the state court's decision was not contrary to, or an unreasonable application of, clearly

22  established Supreme Court law.  See 28 U.S.C. § 2254(d)(1).

23          2.      Sufficiency of the Evidence for Pattern of Criminal Gang Activity

24      At trial, the prosecution's gang expert testified that he was an expert in Hispanic criminal

25  street gangs.  (Resp. Ex. 6 at 7.)  Norteño gang member and Sureño gang members have conflict

26  between each other, which originated in the state prisons.  (Id. at 7-8.)  At the time of trial,

27  almost every Hispanic street gang in San Jose identified themselves as either Norteño or Sureño.

28

1   (<u>Id.</u> at 8.)  Sureños from different gangs often "hang out" and commit crimes together.  (<u>Id.</u>)  In

2   April 2005, VTG was an ongoing Sureño street gang, and petitioner was an admitted member of

3   the VTG.  (<u>Id.</u>)  Varrio Peligrosos, or Varrio Paisanos Locos ("VPL"), was an ongoing Sureño

4   street gang, of which Lenin and Luis Garcia were admitted members.  (<u>Id.</u>)  The expert testified

5   that he had no information that Buffie, Nicholas, Luis, Arthur, Eddie, or William were associated

6   with a gang.  (<u>Id.</u>)  Ashley admitted that she associated with Norteños, and Nicholas had also

7   "hung out" with Norteños.  (<u>Id.</u>)  In the expert's opinion, the primary activities of the VPL are

8   assaults, assaults with deadly weapons, robberies, and making threats.  (<u>Id.</u> at 9.)  The expert

9   testified about three gang members who were each convicted of assault with a deadly weapon on

10   Norteño gang members, or in front of other Sureño gang members.  (<u>Id.</u>)  The primary activities

11   of the VTG are assaults, assaults with a deadly weapon, homicides, intimidation, and making

12   threats.  (<u>Id.</u>)  The expert testified about a number of VTG members who were convicted of

13   exactly those crimes.  (<u>Id.</u>)

14       California law provides for a sentence enhancement for crimes committed "for the

15   benefit of, at the direction of, or in association with any criminal street gang." Cal. Penal Code §

16   186.22(b)(1).  Specifically, "the prosecution must prove that the crime for which the defendant

17   was convicted had been 'committed for the benefit of, at the direction of, or in association with

18   any criminal street gang, with the specific intent to promote, further, or assist any criminal

19   conduct by gang members.  In addition, the prosecution must prove that the gang (1) is an

20   ongoing association of three or more persons with a common name or common identifying sign

21   or symbol; (2) has as one of its primary activities the commission of one or more of the criminal

22   acts enumerated in the statute; (3) includes members who either individually or collectively have

23   engaged in a 'pattern of criminal gang activity' by committing, attempting to commit, or

24   soliciting two or more of the enumerated offenses (the so-called 'predicate offenses') during the

25   statutorily defined period."  (Resp. Ex. 6 at 17.) (Internal citations omitted.)

26       Petitioner argues that the gang expert's testimony lacked the proper foundation to

1    establish that any of the persons listed in the documentary evidence were members of either the

2    VPL or VTG.  The California Court of Appeal rejected petitioner's claim, stating:

3            In this case, Detective Corona testified that he had personally investigated
             about 160 Hispanic criminal street gang cases during his three years with the
4            San Jose Police Department.  During his entire career, he had contacted over
             2,000 gang members, he had been the primary investigating officer in at least
5            500 Hispanic gang cases, and he had assisted in investigating over 300 other
             gang-related cases.  He also testified that, besides his on-the-job training, he
6            had attended several gang conferences and courses throughout his career.
             Based on his training and experience, Corona was found to be an expert in the
7            area of Hispanic criminal street gangs.  Corona testified as an expert that
             defendant was an admitted member of the VTG gang and that, in his opinion
8            VTG was primarily engaged in various statutorily enumerated felonies,
             including assault with a deadly weapon and witness intimidation.  (See §
9            186.22, subd. (e).)  Corona presented documentary evidence of convictions
             for such statutorily enumerated offenses and he testified that, because of the
10           facts he described underlying the documented convictions, those offenses
             were committed by VTG gang members other than defendant.  The offenses
11           Corona testified were committed by VTG gang members were an assault with
             a deadly weapon by Alejandro Calderon and Silvestre Caracheo in June 2001,
12           the making of criminal threats by Caracheo and Jose Rodriquez in February
             2001, the dissuading a witness by Juan Magana in November 2000, an assault
13           with a deadly weapon by Ricardo Alvarado in June 1998, a first degree
             murder by Victor Yepez in August 1997, and an assault with a deadly weapon
14           by Gonzalo Polonco in March 2000.  The court instructed the jury that in
             evaluating the believability of an expert witness, it could consider "the
15           expert's knowledge, skill, experience, training, and education, the reasons the
             expert gave for the opinion, and the facts or information on which the expert
16           relied in reaching that opinion."  (See CALCRIM No. 332.)  Based on this
             record, we find that Corona's expert testimony was sufficient to prove that
17           VTG gang members have committed the required predicate offenses.

18   (Resp. Ex. 6 at 18-19.)

19           It is decisive here that a federal "sufficiency of the evidence" inquiry is channeled by

20   state law – although federal law requires sufficient evidence, it is state law that sets out the

21   elements as to which there must be sufficient evidence.  Sarausad v. Porter, 479 F.3d 671, 678

22   (9th Cir. 2007) (Jackson standard must be applied with explicit reference to the substantive

23   elements of the criminal offense as defined by state law), reversed on other grounds by

24   Waddington v. Sarausad, 555 U.S. 179 (2009).  In California, expert testimony can be based on

25   material not ordinarily admissible, as long as it is reliable, and of a type reasonably relied upon

26   by experts in that particular field.  See People v. Gardeley, 14 Cal. 4th 605, 618 (1996).  "Thus, a

27   gang expert may rely upon conversations with gang members, his or her personal investigations

28

     Order Denying Petition for Writ of Habeas Corpus; Denying Certificate of Appealability
     G:\PRO-SE\SJ.Rmw\HC.10\Neri867den.wpd

1   of gang-related crimes, and information obtained from colleagues and other law enforcement

2   agencies.  Likewise, an individual's membership in a criminal street gang is a proper subject for

3   expert testimony."  People v. Duran, 97 Cal. App. 4th 1448, 1463-64 (2002).

4           Here, the California Court of Appeal's rejection of petitioner's claim was reasonable.

5   Detective Corona testified that persons listed in the documentary evidence – certified copies of

6   convictions – were members of the VTG.  See, e.g., Gardeley, 14 Cal. 4th at 625 (relying on

7   conviction record of person who expert had testified was a member of the Family Crip gang).

8   Each conviction was for a crime in which the VTG was primarily engaged.  Thus, there was

9   constitutionally sufficient evidence to support the jury's findings as to the sentence

10  enhancement.  Accordingly, petitioner is not entitled to habeas relief based on this claim.

11          3.      "Kill Zone" Instruction and Prosecutorial Argument

12          Petitioner claims that CALCRIM No. 600, as given, failed to define the "kill zone," and,

13  in conjunction with the prosecutor's incorrect opening argument, misled the jury and lowered the

14  prosecution's burden of proof.  In addition, petitioner argues that the "kill zone" instruction

15  should not have been given because his indiscriminate shooting did not provide a sufficient

16  factual basis to support the giving of CALCRIM No. 600.

17          The trial court instructed the jury pursuant to a modified version of CALCRIM No. 600

18  as follows:

19          The defendant is charged in Counts 2 and 3 with the attempted murder of
            Buffie Johnson and Luis Lopez, respectively, in violation of Penal Code
20          section 664(a)- 187.  [¶] To prove that the defendant is guilty of attempted
            murder, the People must prove that: [¶] 1. The defendant took a direct but
21          ineffective step toward killing another person; AND [¶] 2. The defendant
            intended to kill that person.  [¶] A direct step requires more than merely
22          planning or preparing to commit murder or obtaining or arranging for
            something needed to commit murder.  A direct step is one that goes beyond
23          planning or preparation and shows that a person is putting his or her plan into
            action.  A direct step indicates a definite and unambiguous intent to kill.  It is
24          a direct movement toward the commission of the crime after preparations are
            made.  It is an immediate step that puts the plan in motion so that the plan
25          would have been completed if some circumstance outside the plan had not
            interrupted the attempt.  [¶] An attempted murder is not committed as to all
26          persons in a group simply because a gunshot is fired indiscriminately at them.
            However, a person may intend to kill a specific victim or victims and at the
27          same time intend to kill anyone in a particular zone of harm or 'kill zone.'  In

28

Order Denying Petition for Writ of Habeas Corpus; Denying Certificate of Appealability
G:\PRO-SE\SJ.Rmw\HC.10\Neri867den.wpd

1    order to convict the defendant of the attempted murder of Luis Lopez, the
     People must prove that the defendant not only intended to kill Buffie Johnson
2    and/or Eddie Lopez but also either intended to kill Luis Lopez, or intended to
     kill anyone within the kill zone.  If you have a reasonable doubt whether the
3    defendant intended to kill Luis Lopez or intended to kill Buffie Johnson or
     Eddie Lopez by harming everyone in the kill zone, then you must find the
4    defendant not guilty of the attempted murder of Luis Lopez.

5    (Resp. Ex. 6 at 19-20.)

6           During the prosecutor's opening argument, he stated, "But in this case you've also been

7    instructed on a legal theory called the kill zone.  And what that is, is that's different than the

8    transferred intent legal theory I told you about before.  Kill zone is you can make a finding that

9    the defendant shot at a group of people and he was intending on killing one or more people in

10   that group.  [¶] And you can also make a finding by the way that he was acting that, when he

11   shot that gun into the group of people, he was intending on killing anybody he was shooting at,

12   including the person he was shooting at so when Eddie Lopez, Luis Lopez and Ashley Garcia, all

13   those people are running into the garage, any shooting at that group, he's firing in what we

14   would call a kill zone, zone of harm, people that are at risk and he just shoots Eddie Lopez and

15   he misses -." (Id. at 20-21.)  Defense counsel interrupted the argument, stating that it was an

16   inaccurate statement of the law.  (Id. at 21.)  In response, the trial court reminded the jury that

17   arguments by the lawyers were secondary to the instructions as given by the court.  (Id.)

18          The California Court of Appeal concluded that the jury was properly instructed on the

19   elements of attempted murder, including the specific intent to murder the person whose

20   attempted murder is charged.  (Id.)

21          CALCRIM No. 600 as given sufficiently states the elements of the offense.
            The 'kill zone' portion of CALCRIM No. 600 was superfluous.  That theory
22          'is not a legal doctrine requiring special jury instructions, as is the doctrine of
            transferred intent.  Rather, it is simply a reasonable inference the jury may
23          draw in a given case: a primary intent to kill a specific target does not rule out
            a concurrent intent to kill others.  CALCRIM No. 600 as given defined "kill
24          zone" as that "particular zone of harm" surrounding "a specific victim or
            victims."  Nothing in Bland suggests that in order to create a "kill zone" there
25          must be a perimeter with a discreet, tangible boundary.  It is the nature and
            scope of the attack that determines whether a "kill zone" is created.  It occurs
26          when the attack is directed at a primary victim, but executed in such a fashion
            as "'to ensure harm to the primary victim by harming everyone in that victim's
27          vicinity.'" [Citation omitted.]  Here, Buffie, Eddie, and Luis were in the front

28

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

of Buffie's house when they were sprayed with bullets.  Buffie was hit by
more than one shot.  One shot hit Eddie in the back as he was trying to get
away, and one shot hit the side of the garage right in front of Luis.  On these
facts, a "kill zone" was created."

(Resp. Ex. 6 at 21-22.)  The court relied on <u>People v. Campos</u>, 156 Cal. App. 4th 1228, 1243

(2007), to reject petitioner's argument that the instruction was ambiguous.  (<u>Id.</u> at 22.)  Instead,

the court agreed with <u>Campos</u> in concluding that the instruction was not necessarily inconsistent

with case law, and it was not reasonably likely that the jury applied the instruction in a way that

violated the Constitution.  (<u>Id.</u> at 22-23.)

　　　　To obtain federal collateral relief for errors in the jury charge, a petitioner must show that

the ailing instruction by itself so infected the entire trial that the resulting conviction violates due

process.  <u>See</u> <u>Estelle v. McGuire</u>, 502 U.S. at 62, 72 (1991).  The challenged instruction may not

be judged in artificial isolation, but must be considered in the context of the instructions as a

whole and the trial record.  <u>See</u> <u>id.</u> at 72.  In other words, the court must evaluate jury

instructions in the context of the overall charge to the jury as a component of the entire trial

process.  <u>United States v. Frady</u>, 456 U.S. 152, 169 (1982) (citing <u>Henderson v. Kibbe</u>, 431 U.S.

145, 154 (1977)).  The relevant inquiry is "whether there is a reasonable likelihood that the jury

has applied the challenged instruction in a manner that prevents the consideration of

constitutionally relevant evidence."  <u>Boyde v. California</u>, 494 U.S. 370, 380 (1990).

　　　　As an initial matter, the state court ruled that the kill zone instruction adequately sets

forth California law regarding the offense; that decision is binding on this court.  <u>See</u> <u>Richey</u>,

546 U.S. at 76.  Further, here, it is not reasonably likely that the jury applied the instruction in a

way that violated the Constitution.  The jury was instructed as to the elements of attempted

murder, including specific intent; it was instructed that it could not convict petitioner under a

"kill zone" theory unless it found that petitioner intended to harm everyone in the zone; it was

specifically instructed that attempted murder is not committed as to all persons in a group merely

because a gunshot is fired indiscriminately at them; and it was reminded that it was to follow the

law as instructed by the court, and that the attorneys may not accurately represent the law.  The

Order Denying Petition for Writ of Habeas Corpus; Denying Certificate of Appealability
G:\PRO-SE\SJ.Rmw\HC.10\Neri867den.wpd

jury is deemed to have followed these instructions, see Weeks, 528 U.S. 225, 234 (2000), and when considering the jury instructions in the context of the whole trial rather than in artificial isolation, the jury instructions did not violate petitioner's due process rights.  See Estelle, 502 U.S. at 72.

Moreover, even if the instruction as given was erroneous, there was no prejudice. Instructions that lessen the prosecution's burden will be subject to harmless error review, rather that structural error review, "unless all the jury's findings are vitiated."  Byrd v. Lewis, 566 F.3d 855, 866 (9th Cir. 2009) (finding application of harmless error analysis of a defective jury instruction was proper because the instructional error was only with respect to one element and did not vitiate the jury's finding of guilt on the charged offense). The record shows that Luis and Ashley were standing in the driveway and ran around the side of the garage to get inside.  Before Luis got inside, he began to hear gunshots.  One shot flew close by him and went into the side wall of the garage two to three feet in front of him.  He heard more shots after he got inside.  As the California Court of Appeal noted, firing toward Luis in a manner "that would have inflicted a fatal would if the bullet had been on target is sufficient to support an inference of intent to kill. Even if the jury found that [petitioner] primarily wanted to kill Buffie or Eddie, it could also have found a concurrent intent to kill Luis."  (Resp. Ex. 6 at 15.)

Given the high deference accorded to the state appellate court's analysis here, the state court's rejection of this claim was not contrary to, or an unreasonable application, or clearly established Supreme Court law.

4.    Jury Instruction to Consider Each Count Separately

Petitioner claims that the trial court erred in failing to instruct the jury that each of the counts charged was a separate crime, and as such, should be considered separately, pursuant to CALCRIM No. 3515.  Specifically, petitioner requested the following instruction, which was rejected:  "Before you may find the defendant guilty of attempted murder as to a particular person you must find that the prosecutor has proved beyond a reasonable doubt both that the defendant had the specific intent to kill and that he had the intent to kill the person named.  As to

1  each of the persons named in counts two through four of the information you must find that the

2  defendant had the specific intent to kill that particular individual before you may find him guilty

3  of the charged offense.  You must separately determine as to each of the people named in counts

4  two, three and four whether the defendant had the specific intent to kill that particular person."

5  (Resp. Ex. 6 at 23.)  Petitioner asserts that the failure to instruct the jury that it must consider

6  each count separately allowed it to reason that if petitioner had the intent to kill Eddie, it must

7  have also had the intent to kill Luis because of the "undefined kill zone."

8          The California Court of Appeal rejected this claim.  (Resp. Ex. 6 at 24-25.)  It reasoned

9  that petitioner's proposed instruction would have conflicted with CALCRIM No. 600, therefore,

10  the trial court properly declined to give it.  Specifically, the state court stated that the proposed

11  instruction would have told the jury that it had to find that petitioner "had the specific intent to

12  kill that particular individual before [it] may find him guilty of the charged offense."  Because

13  CALCRIM No. 600 permitted a conviction of attempted murder of Luis either:  (1) by finding

14  that petitioner intended to kill Luis, or (2) intended to kill Buffie and/or Eddie by harming

15  everyone within the kill zone, petitioner's  proposed instruction indeed conflicted with

16  CALCRIM No. 600.

17          A state trial court's refusal to give an instruction does not alone raise a ground cognizable

18  in a federal habeas corpus proceedings.  See Dunckhurst v. Deeds, 859 F.2d 110, 114 (9th Cir.

19  1988).  The error must so infect the trial that the defendant was deprived of the fair trial

20  guaranteed by the Fourteenth Amendment.  See id.  The omission of an instruction is less likely

21  to be prejudicial than a misstatement of the law.  See Walker v. Endell, 850 F.2d 470, 475-76

22  (9th Cir. 1987).  Thus, a habeas petitioner whose claim involves a failure to give a particular

23  instruction bears an "especially heavy burden."  Villafuerte v. Stewart, 111 F.3d 616, 624 (9th

24  Cir. 1997) (quoting Henderson v. Kibbe, 431 U.S. 145, 155 (1977)).  The significance of the

25  omission of such an instruction may be evaluated by comparison with the instructions that were

26  given.  Murtishaw v. Woodford, 255 F.3d 926, 971 (9th Cir. 2001).

27

28

Order Denying Petition for Writ of Habeas Corpus; Denying Certificate of Appealability
G:\PRO-SE\SJ.Rmw\HC.10\Neri867den.wpd

1   Here, petitioner's proposed instruction conflicted with CALCRIM No. 600, and, under

2   these facts, was not a correct statement of the law.  Further, there is no reasonable likelihood that

3   the jury erroneously reasoned that if petitioner had the intent to kill Eddie, it must have also had

4   the intent to kill Luis because of the "undefined kill zone."  As stated above, the jury was

5   properly instructed that in order to convict petitioner, it had to find beyond a reasonable doubt

6   either that petitioner had specific intent to kill Luis, or a specific intent to kill Buffie and/or

7   Eddie and everyone within the kill zone.  Because the jury is presumed to follow its instructions,

8   see Weeks, 528 U.S. at 234, the state court's rejection of this claim was not contrary to, or an

9   unreasonable application of, clearly established Supreme Court law.

10          5.      Cunningham claim

11          Petitioner claims that the trial court's imposition of the upper term in Count 2, the

12   attempted murder of Buffie, violated his right to a jury trial and proof beyond a reasonable doubt

13   when it based the sentence on factors not found true by a jury.  At sentencing, the trial court

14   found three aggravating factors, stating that each factor justified imposition of the upper term:

15   (1) petitioner shot Buffie not once, but three or four times; (2) Buffie was standing in front of her

16   home attempting to prevent violence; and (3) petitioner was only a few feet from Buffie when he

17   opened fire without any reasonable provocation.  (RT 1516.)  Without deciding whether the trial

18   court violated petitioner's right to a jury trial, the California Court of Appeal instead concluded

19   that any Cunningham error was harmless.

20          The Sixth Amendment to the United States Constitution guarantees a criminal defendant

21   the right to a trial by jury.  U.S. Const. amend. VI.  This right to a jury trial has been made

22   applicable to state criminal proceedings via the Fourteenth Amendment's Due Process Clause.

23   Duncan v. Louisiana, 391 U.S. 145, 149-50 (1968).  Apprendi v. New Jersey, 530 U.S. 466, 120

24   (2000), and its progeny extended a defendant's right to trial by jury to the fact finding used to

25   make enhanced sentencing determinations as well as the actual elements of the crime.  "Other

26   than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the

27   prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable

28

Order Denying Petition for Writ of Habeas Corpus; Denying Certificate of Appealability
G:\PRO-SE\SJ.Rmw\HC.10\Neri867den.wpd

1  doubt." Id. at 488-90.  The "statutory maximum" for Apprendi purposes is the maximum

2  sentence a judge could impose based solely on the facts reflected in the jury verdict or admitted

3  by the defendant; that is, the relevant "statutory maximum" is not the sentence the judge could

4  impose after finding additional facts, but rather is the maximum he or she could impose without

5  any additional findings.  Blakely v. Washington, 542 U.S. 296, 303-04 (2004).  In Cunningham

6  v. California, 549 U.S. 270 (2007), the Court held that California's determinate sentencing law

7  ("DSL") - which used a sentencing triad of lower/middle/upper terms - violated the Sixth

8  Amendment because it allowed the sentencing court to impose an upper term sentence based on

9  aggravating facts that it found to exist by a preponderance of the evidence.  See id. at 288-89.

10  Concluding that the middle term was the relevant statutory maximum, and noting that

11  aggravating facts were found by a judge and not the jury, the Supreme Court held that

12  California's DSL violated the rule set out in Apprendi.  Id. at 288-89, 293.

13        On March 30, 2007, in response to the Supreme Court's suggestion in Cunningham that

14  California could cure any constitutional defect in section 1170(b) by leaving the selection of an

15  appropriate sentence to the judge's discretion, Cunningham, 549 U.S. at 293-94, the California

16  Legislature enacted Senate Bill 40, which amended section 1170(b).  See Cal. Stats.2007, ch. 3

17  (S.B.40), § 3, eff. Mar. 30, 2007; Butler v. Curry, 528 F.3d 624, 630 n.5 (9th Cir. 2008)

18  (acknowledging section 1170(b)'s amendment). Under amended section 1170(b), a trial court

19  still exercises its discretion in selecting among the upper, middle or lower terms, but no

20  additional fact finding is required to impose an upper or lower term.  See Butler, 528 F.3d at 652

21  n.20 ("imposition of the lower, middle, or upper term is now discretionary and does not depend

22  on the finding of any aggravating factors"); accord People v. Sandoval, 41 Cal. 4th 825, 843-45

23  (2007).

24        Here, the trial court sentenced petitioner on September 7, 2007 – after the effective date

25  of the amendment to section 1170(b). The applicable law at sentencing was California's

26  amended sentencing scheme.  The applicable law at sentencing therefore was California's

27  amended sentencing scheme, which the court finds complies with Cunningham as applied to

28

petitioner. Specifically, under amended section 1170(b), the trial court was not required to find an additional fact in order to impose the upper term sentence. In fact, because the upper term at the time of petitioner's sentencing was the "statutory maximum" within the meaning of Cunningham, the trial court was permitted to rely on facts in addition to those found by the jury in the exercise of its discretion. See United States v. Booker, 543 U.S. 220, 233 (2005) ("[W]hen a trial judge exercises his discretion to select a specific sentence within a defined range, the defendant has no right to a jury determination of the facts that the judge deems relevant.").

In Cunningham, the Supreme Court acknowledged that several states had modified their sentencing schemes in the wake of Apprendi and Blakely to permit judges broad discretion within a statutory range, "which 'everyone agrees' encounters no Sixth Amendment shoal." Cunningham, 549 U.S. at 294 (quoting Booker, 543 U.S. at 233). Cunningham left "the ball . . . in California's court" to revise its system accordingly. Id. at 293-94. The California Legislature did exactly that. Specifically, it adopted "Cunningham's suggestion that California could comply with the federal-trial constitutional guarantee while still retaining determinate sentencing, by allowing trial judges broad discretion in selecting a term within a statutory range, thereby eliminating the requirement of a judge-found factual finding to impose an upper term." People v. Wilson, 164 Cal. App. 4th 988, 992 (2008).

In view of California's decision to follow Cunningham's suggested sentencing scheme in order to avoid a Sixth Amendment shoal, the state supreme court's rejection of petitioner's Sixth Amendment claim under such sentencing scheme cannot be said to be contrary to, or an unreasonable application of, clearly established Supreme Court precedent. See 28 U.S.C. § 2254(d); accord McCowan v. Marshall, No. 10-0473 CRB, 2001 WL 1544490, at * 2-3 (N.D. Cal. April 25, 2011) (upholding upper term sentence imposed after effective date of DSL amendment); Espinoza Bermudez v. Clark, No. 09-275-OWW-SMS, 2010 WL 2089670, at *7 (E.D. Cal. May 21, 2010) (same). Put simply, petitioner has not shown that there was "no

1    reasonable basis for the state court to deny relief." <u>Harrington v. Richter</u>, 131 S.Ct. 770, 784

2    (2011).

3                                              **CONCLUSION**

4          The petition for a writ of habeas corpus is DENIED.  The federal rules governing habeas

5    cases brought by state prisoners require a district court that denies a habeas petition to grant or

6    deny a certificate of appealability ("COA") in its ruling.  Petitioner has failed to make a

7    substantial showing that his claims amounted to a denial of his constitutional rights, or

8    demonstrate that a reasonable jurist would find the denial of his claims debatable or wrong.

9    <u>Slack v. McDaniel</u>, 529 U.S. 473, 484 (2000).  Accordingly, a COA is DENIED.

10         The clerk shall enter judgment and close the file.

11         IT IS SO ORDERED.

12   DATED: _____

                                            *Ronald M. Whyte*
13                                          RONALD M. WHYTE
                                            United States District Judge

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Order Denying Petition for Writ of Habeas Corpus; Denying Certificate of Appealability
G:\PRO-SE\SJ.Rmw\HC.10\Neri867den.wpd

UNITED STATES DISTRICT COURT

FOR THE

NORTHERN DISTRICT OF CALIFORNIA


ESTEBAN NERI JR,

            Plaintiff,

  v.

KATHLEEN ALLISON et al,

            Defendant.

_____/

Case Number: CV10-02867 RMW

**CERTIFICATE OF SERVICE**


I, the undersigned, hereby certify that I am an employee in the Office of the Clerk, U.S. District Court, Northern District of California.

That on March 28, 2012, I SERVED a true and correct copy(ies) of the attached, by placing said copy(ies) in a postage paid envelope addressed to the person(s) hereinafter listed, by depositing said envelope in the U.S. Mail, or by placing said copy(ies) into an inter-office delivery receptacle located in the Clerk's office.


Esteban Neri F87757
Corcoran-SATF
Housing: C1-114
P.O. Box 5246
Corcoran, CA 93212


Dated: March 28, 2012

                                    Richard W. Wieking, Clerk
                                    By: Jackie Lynn Garcia, Deputy Clerk